**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JUDITH CORONA,             )
                                 )
                 Plaintiff,       )      2:07-cv-1419
     v.                        )
                                 )
MICHAEL J. ASTRUE,       )
COMMISSIONER OF SOCIAL SECURITY,   )
                                 )
               Defendant.     )


**MEMORANDUM OPINION AND ORDER OF COURT**

**I.    Introduction**

Pending now before the court are cross-motions for summary judgment based on the

administrative record: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Document No.

10) and DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Document No. 8).  The

motions have been fully briefed and are ripe for resolution.

Plaintiff, Judith Corona, (hereinafter "Plaintiff") brought this action pursuant to 42 U.S.C.

§ 405(g) to seek review of the final determination of the Commissioner of Social Security

(hereinafter "Commissioner") which denied her application for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433.

At the outset, the Court notes Plaintiff's late filing of her Motion for Summary Judgment

and Brief in Support (Document No. 9) and the Government's objection in its Reply Brief to

Plaintiff's Motion for Summary Judgment (Document No. 13).[1]  The Court is not inclined to

---

[1]See this Court's Order of February 20, 2008 (Document No. 7).

1

sanction Plaintiff for the tardy filing by her attorney and will therefore, consider Plaintiff's

Motion for Summary Judgment in addition to the Defendant's Motion and his Reply Brief. The

Court, however, will disregard Plaintiff's Reply Brief in support of her Motion for Summary

Judgment (Document No. 14). Plaintiff's reply brief does not address any of the Government's

arguments and contains various erroneous assertions concerning a different plaintiff and

unrelated cases.

## II.  **Background**[2]

### A.  **Facts**

Plaintiff was born on September 22, 1958, was 48 years old during the period at issue,

and was considered to be a "younger individual" as defined in 20 C.F.R. § 404.1563(b). R. 6, at

43. Plaintiff completed high school and worked as a laundry laborer for over twenty years. R. 6,

at 21, 49, 54.

Plaintiff alleges disability, as of May 11, 2005, due to bipolar disorder and status post left

hip injury. R. 6, at 30, 43. She later amended her onset date of disability to June 18, 2005 due to

a motor vehicle accident on the same day. R. 6-7, at 42. Plaintiff went to the emergency room at

the Westmoreland Regional Hospital (hereinafter "Westmoreland") on June 19, 2005 as a result

of injuries incurred in the accident. R. 6-2, at 31. She was diagnosed with a shoulder strain,

back strain, a contusion, and a nasal fracture. R. 6-2, at 38-39. X-rays of her left shoulder and

---

[2]Defendant filed the Transcript of the Administrative Proceeding in eight parts
(Document No. 6, part 1, 55 pages in total; Document No. 6-2, part 2, 55 pages in total;
Document No. 6-3, part 3, 55 pages in total; Document No. 6-4, part 4, 55 pages in total;
Document No. 6-5, part 5, 55 pages in total; Document No. 6-6, part 6, 55 pages in total;
Document No. 6-7, part 7, 55 pages in total; and Document No. 6-8, part 8, 8 pages in total. The
Court will cite to the Transcript by listing the document number and the page (an example being,
R. 6-3, at 1, which refers to the Transcript, Document No. 6-3, at page 1).

hip revealed no fractures or dislocation.  R. 6-2, at 44-45.  Plaintiff returned to the hospital on June 22, 2005 complaining of headaches.  R. 6-2, at 48, 55.  A CT scan of her brain revealed no acute or significant intracranial abnormality and an x-ray of her cervical spine presented no acute skeletal findings.  R. 6-3, at 2-3.  There were minimal to moderate degenerative changes between C5/C6 with the mild bony encroachment of their corresponding neural foramen.  R. 6-2, at 111. Plaintiff was discharged on the same day and advised to follow up with her primary care physician, Dr. Jill M. Constantine (hereinafter "Dr. Constantine").  R. 6-2, at 55.

Plaintiff saw Dr. Andrew Stroh (hereinafter "Dr. Stroh") on June 23, 2005.  R. 6-3, at 4. He observed that Plaintiff became dizzy when she had to perform a range of motions.  *Id.* Plaintiff also complained of an increase in pain in her neck and shoulder.  *Id.*  Dr. Stroh recommended that Plaintiff receive physical therapy from her family physician and he noted that Plaintiff was to return to work.  *Id.*, at 6-4, at 33.

Plaintiff saw Dr. S.P. Barua (hereinafter "Dr. Barua") the following day, on June 24, 2005, complaining of headaches, neck pain, and stiffness.  On June 27, 2005, Plaintiff saw Dr. Mark R. Klingensmith (hereinafter "Dr. Klingensmith").  R. 6-3, at 12-13.  Dr. Klingensmith reviewed Plaintiff's CT scan which did not show the presence of any significant fracture.  R. 6-3, at 13.  He observed that Plaintiff had a post nasal injury but she was not suffering from a nasal fracture.  *Id*.  Dr. Barua also noted that Plaintiff had remarkable restriction of lumbar motion in flexion, tenderness, and muscle spasm in her lower back.  R. 6-4, at 33.  The Patrick, straight leg raise, and Lasegue tests and neurologic exams were negative.  *Id.*  Plaintiff was also experiencing tenderness in the dorsal spine and lower lumbar area.  *Id.*  Dr. Barua recommended that Plaintiff not return to work and instead go to physical therapy for three weeks.  This

recommendation was contrary to Dr. Stroh's order, the day before, for Plaintiff to return to work. *Id.*

The record reflects that Plaintiff saw Dr. Barua again on July 25, 2005 and he noted Plaintiff's continuing physical therapy. *Id.* Plaintiff also continued to experience headaches with pain in her neck. *Id.* On examination, Dr. Barua observed there was a 30% limitation of the cervical spine motion although her neurological examination was negative. *Id.* Dr. Barua gave her trigger point injections and advised her to continue with the physical therapy in the neck only. *Id.* Plaintiff received more trigger block injections on her visit to Dr. Barua on August 22, 2005. R. 6-4, at 31.

On September 6 and 21, 2005, Plaintiff presented to Dr. Barua with a complaint of pain dispersed throughout the dorsal spine area of her lower back. *Id.* Dr. Barua did not think that there was any disc involvement. *Id.* Plaintiff was neurologically stable and he recommended a dorsal lumbar corset and that Plaintiff continue with her physical therapy regime. R. 6-4, at 30-31. Dr. Barua eventually concluded that Plaintiff was suffering from chronic myofascial pain. R. 6-4, at 30.

On November 11, 2005, Dr. Barua noted that the dorsal lumbar corset was working although Plaintiff's pain was still quite severe and the prescribed lithium she was taking was contributing to her depression. R. 6-6, at 37. Plaintiff was still neurologically stable and Dr. Barua observed that if Plaintiff was feeling better, she could return to some form of lighter duty work and eventually, if possible, move toward full duty. *Id.* In December 2005, Plaintiff mentioned the subject of joining a gym to Dr. Barua who encouraged her to do so and to become active. *Id.* He noted that she had stopped taking lithium and was on a different medication for

depression.  *Id.*

Plaintiff saw Dr. Barua in March 2006.  R. 6-6, at 34.  Dr. Barua observed that although still in pain, primarily in the cervical dorsal area, Plaintiff had been going to aerobic exercise classes.  *Id.*  Plaintiff was not experiencing any muscle spasms but there was some general tenderness.  *Id*  He recommended that Plaintiff continue with her medication and exercises. Plaintiff returned on May 19, 2006, informing Dr. Barua of her intention to visit the Office of Vocational Rehabilitation  (hereinafter "OVR") and find a job that accommodated her chronic pain.  R. 6-6, at 33.  Plaintiff had been using a brace which Dr. Barua observed was helping her posture.  *Id.*  He did recommend that Plaintiff cut back on her gym visitation to reduce the aggravation in the areas where she was experiencing pain.  *Id*.

On July 12, 2005, Plaintiff went to the Western Psychiatric Institute and Clinic (hereinafter "WPIC") complaining of depression which she stated was exacerbated by the accident in June 2005.  R. 6-3, at 18, 22.  Plaintiff stated that she had not left the house since the June 18, 2005 accident, she slept eighteen (18) to twenty (20) hours a day and had gained fourteen (14) pounds due to an increased appetite.  R. 6-3, at 19.  She also stated that she had been previously diagnosed with depression and bipolar disorder and had been receiving psychiatric treatment for twenty-six (26) years.  *Id*.  Plaintiff was diagnosed with bipolar depression after Plaintiff checked herself in to WPIC on July 14, 2005.  R. 6-3, at 19.  She was discharged on July 22, 2005 and referred to Dr. Alexandre Dombrovski (hereinafter "Dr. Dombrovski").  R. 6-3, at 18.

Dr. Dombrovski followed up with Plaintiff after her WPIC discharge on July 25, 2005. R. 6-4, at 51.  Plaintiff reported that her mood had improved, her "negative thoughts" were

resolving and she did not feel any hopelessness. *Id*. He prescribed a reduction in the strength of

lithium that Plaintiff was taking. *Id*. Dr. Dombrovski spoke with Plaintiff the next day and she

stated that her mood was "pretty good". R. 6-4, at 50. On August 2, 2005, Plaintiff felt a marked

improvement and she was satisfied with the change in the lithium prescription. R. 6-4, at 47.

Her outlook changed on August 9, 2005 when she reported having low morale, feeling scared

and expressing thoughts of suicide. R. 6-4, at 46.

Plaintiff continued to experience a poor mood and on August 29, 2008, Dr. Dombrovski

wrote a letter to Excela Health Westmoreland stating that Plaintiff was in the throes of a severe

depression episode and required hospitalization and aggressive medication treatment. R. 6-4, at

41. He also stated that Plaintiff was unable to perform her work duties and anticipated her

disability continuing for another four to six weeks. *Id*. He did indicate that once Plaintiff's

mood had improved and was "better controlled", she would be able to return to work. *Id*. By

October 15, 2005, Dr. Dombrovski reported that Plaintiff's mood had improved. R. 6-4, at 37.

Again, on October 22, 2005, Dr. Dombrovski reported that Plaintiff would not be able to work

but stated that she could return to work in two to three months' time. R. 6-5, at 55.

On February 6, 2006, Dr. Michael Niemiec (hereinafter "Dr. Niemiec") conducted a

physical residual functioning capacity (hereinafter "RFC") assessment. He found that Plaintiff

could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, sit and

stand and/or walk for about six hours in an eight-hour workday. R. 6-5, at 17. Her postural

limitations include occasional balancing, stooping, kneeling, crouching, and crawling. R. 6-5, at

18. Dr. Niemiec concluded that Plaintiff is able to take care of herself, maintain her home, and

drive a car. R. 6-5, at 25. He also observed that Plaintiff had obtained various forms of

treatment for her symptoms, all of which has been generally successful in controlling her symptoms. *Id*.

The record also reflects Plaintiff's visitations with Dr. Dombrovski in 2006. On March 4, 2006, Dr. Dombrovski reported that Plaintiff was feeling anxious but was otherwise doing well and was to marry in six months. R. 6-5, at 48. Plaintiff's condition had changed by the end of March and she was once again feeling depressed and suffering from chaotic sleep patterns and lack of motivation. R. 6-5, at 47.

By the beginning of May 2006, Plaintiff was feeling less depressed. R. 6-5, at 45. She continued to feel better in June 2006. R. 6-5, at 44. On July 15, 2006, Dr. Dombrovski noted that Plaintiff was still depressed. R. 6-5, at 43. There was also a note on the same July 15, 2006 report, stating that Dr. Dombrovski's office would have to construct a letter (hereinafter "Dombrovski record notation") to the OVR informing the OVR that Plaintiff was stable enough to be retrained for employment. *Id*.

On August 19, 2006, Dr. Dombrovski completed a functional capabilities evaluation in which he indicated that Plaintiff had an "attentional impairment" (in other words, her ability to comprehend and follow instructions was very low, at level two) and suffered from fatigue and poor motivation. R. 6-6, at 41-42. He concluded that he was not able to foresee when she could return to work. R. 6-6, at 42.

In September 2006, Plaintiff was referred to OVR where Dr. Scott Martin (hereinafter "Dr. Martin"), a certified psychologist, performed a vocational assessment. R. 6-6, at 52. Plaintiff stated she has trouble managing distractions and that she has never been treated for attentional disorder. R. 6-6, at 55. She rated her ability to focus, monitor herself, and complete

tasks independently and after being interrupted as fair. *Id*. Dr. Martin observed that Plaintiff was friendly and cooperative although her "affective presentation was suggestive of a mild to moderate degree of anxiety and depression." R. 6-7, at 1. He noted that Plaintiff had significant learning disabilities in such areas as spelling/writing, arithmetic and reading which contributed to the under-development of her cognitive potential. *Id*. Her test scores in these areas were below expectations. R. 6-7, at 2-3.

Despite Plaintiff's limitations, Dr. Martin intimated that Plaintiff could handle a training/employment related experience of a mild-to moderate level of complexity. R. 6-7, at 1. He concluded that Plaintiff would be best suited to occupations that were "mildly complex, non-speeded, medical clerical type of work" which were generally "less physically demanding and highly over learned/structured." R. 6-7, at 33. Such jobs would include admissions clerk, an answering service worker, a file room technician, an information desk clerk, a supplies/inventory clerk and a mailroom clerk. *Id*.

Plaintiff underwent an overnight polysomnography test on July 10, 2006 which revealed obstructive sleep apnea syndrome with shallow and fragmented sleep and excellent sleep efficiency. R. 6-6, at 27. A daytime polysomnography test was conducted on July 12, 2006 which showed a mild sleep related breathing disorder but no significant nocturnal hypoxemia. R. 6-6, at 25.

The record also contains an October 6, 2006 letter prepared by Robert Majcher (hereinafter "Mr. Majcher"), a social worker, who stated that he had been seeing Plaintiff on a weekly basis since June 25, 2005. R. 6-6, at 3. Mr. Majcher wrote that Plaintiff had a lot of physical pain and was unable to work. *Id*.

Plaintiff also went to a pain clinic where she saw Dr. Andrzej Zielke (hereinafter "Dr. Zielke"). R. 6-6, at 12. He diagnosed her with myofascial pain syndrome, cervicalgia (pain in the neck), and chronic headaches. *Id.* He administered trigger point injections and occipital nerve blocks. *Id.* Plaintiff saw Dr. Zielke on October 5, 2006 where she received occipital nerve blocks resulting in a gradual and quick resolution of her headache. R. 6-6, at 12-13. On the same day as her presentation to Dr. Zielke, Plaintiff also completed a pain self-assessment form with conflicting assertions. R. 6-6, at 16. She reported that she was experiencing stabbing and aching pain in her hand, neck, shoulder and back. *Id.* She also stated that she was receiving counseling even though she had indicated that she was not depressed, slept eight hours a night, had no difficulty sleeping and did not wake up during the night. *Id.*

**B.    Procedural History**

Plaintiff filed an application for DIB on September 15, 2005 which was denied. R. 6, at 30, 37. Plaintiff timely requested a hearing which took place before Administrative Law Judge Patricia C. Henry (hereinafter "ALJ") on November 7, 2006, at which Plaintiff, represented by counsel, testified along with vocational expert (hereinafter "VE"), Mitchell A. Schmidt. R. 6, at 14. Plaintiff amended her application, by changing her onset date of disability to June 18, 2005. R. 6-7, at 19. She explained that the original injury (on which the May 11, 2005 onset date was based) had resolved and the new onset date was attributable to a motor vehicle accident on June 18, 2005. R. 6-7, at 40-42. The ALJ denied Plaintiff's claim under the five-step sequential analysis used to determine disability and found that Plaintiff was not disabled.

At step one, the ALJ determined that Plaintiff has not engaged in substantial gainful work activity since alleging disability on June 18, 2005. The ALJ determined at step two that

Plaintiff's severe impairments consisted of bipolar disorder with depression and headaches. R. 6, at 16. She also found that there was not sufficient evidence in the record to support Plaintiff's alleged sleep apnea. *Id*. At step three, the ALJ concluded that Plaintiff's impairments did not meet or equal one of the "listed impairments" set forth in 20 C.F.R. 404 Subpart P, App. 1, Regulation No. 4 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). *Id*. The ALJ found at step four that Plaintiff retained the residual functional capacity to perform work at the light level of physical exertion. R. 6, at 19. She found that Plaintiff is able to perform simple, routine, repetitive tasks in a slow-paced production environment requiring simple, work-related decisions and relatively few work place changes. *Id*. At step five, the ALJ found that Plaintiff was unable to perform any of her past relevant work which was deemed to be normally medium, unskilled work but in actuality, heavy work as performed by Plaintiff. R. 6, at 23. The ALJ found that Plaintiff had the residual functional capacity to perform other work that exists in the national economy and that the Plaintiff was not disabled during the time period from June 18, 2005 through the date of the ALJ's decision. R. 6, 23-24.

Plaintiff requested a review of the ALJ's decision. The Appeals Council affirmed the ALJ's decision which became the final decision of the Commissioner. Plaintiff then filed the instant complaint to seek judicial review of the Commissioner's decision.

## III.    Legal Analysis

### A.    <u>Standard of Review</u>

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. §§ 405(g). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court. 42 U.S.C. § 405(g); *Schaudeck v. Comm'n of*

*Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999). The Supreme Court has defined

"substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971); *Hartranft v. Apfel*, 181

F.3d 358, 360 (3d Cir. 1999). It consists of more than a scintilla of evidence, but less than a

preponderance. *Stunkard v. Secretary of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir.

1988).

When resolving the issue of whether an adult claimant is or is not disabled, the

Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920

(1995). This process requires the Commissioner to consider, in sequence, whether a claimant (1)

is working, (2) has a severe impairment, (3) has an impairment that meets or equals the

requirements of a listed impairment, (4) can return to his or her past relevant

work, and (5) if not, whether he or she can perform other work. *See* 42 U.S.C . § 404.1520;

*Burnett v. Commissioner of Social Security*, 220 F.3d 112, 118-19 (3d Cir. 2000) (*quoting*

*Plummer v. Apfel*, 186, F.3d 422, 428 (3d Cir. 1999)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is

some "medically determinable basis for an impairment that prevents him or her from engaging in

any substantial gainful activity for a statutory twelve-month period." *Kangas v. Bowen*, 823 F.2d

775, 777 (3d Cir. 1987); 42 U.S.C. § 423 (d)(1) (1982). This may be done in two ways:

> (1) by introducing medical evidence that the claimant is disabled per se
> because he or she suffers from one or more of a number of serious impairments
> delineated in 20 C.F.R. Regulations No. 4, Subpt. P., Appendix 1. *See Heckler*
> *v. Campbell*, 461 U.S. 458 (1983); *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d
> at 777; or,

> (2) in the event that claimant suffers from a less severe impairment, by

> demonstrating that he or she is nevertheless unable to engage in "any other
> kind of substantial gainful work which exists in the national economy . . . ."
> *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes plaintiff from returning to his or her former job. *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777. Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d at 777; *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986); *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir. 1979).

When a claimant has multiple impairments which may not individually reach the level of severity necessary to qualify any one impairment for Listed Impairment status, the Commissioner, nevertheless, must consider all of the impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Bailey v. Sullivan*, 885 F.2d 52 (3d Cir. 1989) ("in determining an individual's eligibility for benefits, the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.")

It is well established that state agency consultants are considered to be "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings of state agency medical and psychological consultants or other program physicians or psychologists as opinion evidence,

except for the ultimate determination about whether [a claimant is] disabled." 20 C.F.R. §

404.1527 (f)(2)(I). However, the opinions of state agency consultants constitute substantial

evidence in support of an ALJ's findings provided they are supported by substantial record

evidence.

**B.    Discussion**

As set forth in the Act and applicable case law, this Court may not undertake a *de novo*

review of the decision of the Commissioner or re-weigh the evidence of record. *Monsour*

*Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986), *cert. denied*, 482 U.S. 905

(1987). The Court must simply review the findings and conclusions of the ALJ to determine

whether they are supported by substantial evidence. 42 U.S.C. § 405(g); *Schaudeck v. Comm'n*

*of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999).

Plaintiff argues that the ALJ erred, as a matter of law, when she failed to accord

controlling weight to the opinion of Plaintiff's treating physician, Dr. Dombrovski. She also

contends that the ALJ erred by not finding Plaintiff's psoriasis to be a severe impairment.

Plaintiff's final argument is that the hypothetical question posed to the VE, by the ALJ, was

incorrect because it did not include all of Plaintiff's work-related limitations as presented in the

administrative record.

The Commissioner asserts that the decision of the ALJ should be affirmed as it is

supported by substantial evidence of record. The Commissioner argues that the ALJ properly

found that Plaintiff did not have an impairment that met or equaled a listed impairment and that

Plaintiff retained the RFC to perform light work and more specifically, the sedentary jobs that

13

were identified by the VE.

1. *The ALJ correctly concluded that the treating source's opinion did not deserve controlling weight as it was not supported by substantial evidence.*

Plaintiff argues that the ALJ erred by not according controlling weight to the medical opinions of Plaintiff's treating psychiatrist, Dr. Dombrovski and the opinions of her social worker, Robert Majcher. Specifically, Plaintiff states that the ALJ ignored Dr. Dombrovski's conclusions that Plaintiff is disabled due to her severe mental health symptoms and Majcher's assertions which support Dr. Dombrovski's disability findings.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.' *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999), (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)) . . . ." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (additional citations omitted). However, a medical opinion is not entitled to controlling weight when it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] case record . . ." 20 C.F.R. § 404.1527 (d)(2).

Furthermore, the ALJ "cannot reject evidence for no reason or for the wrong reason" but must weigh conflicting medical evidence and can choose whom to credit. *Id.* at 317, *quoting Plummer*, 186 F.3d at 429 (additional citations omitted). *See also Morales*, 225 F.3d at 317-318 (citations omitted); *Fargnoli v. Massanari*, 247 F.3d 34, 42-43 (3d Cir. 2000) (although ALJ may

weigh conflicting medical and other evidence, he must give some indication of the evidence he rejects and explain the reasons for discounting the evidence); *Burnett v. Comm'r of Soc. Sec.,* 220 F.3d 112, 121 (3d Cir. 2000) (although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence).

Plaintiff points to the three occasions in which Dr. Dombrovski noted that she was disabled and would not be able to work. R. 6-4, at 41; R. 6-5, at 55; R. 6-6, at 42. Dr. Dombrovski first opined about Plaintiff's inability to work on August 29, 2005. R. 6-4, at 41. He sent a letter to Excela Health Westmoreland stating that Plaintiff's disability would last for another four to six weeks and she would need hospitalization and an aggressive medication regimen. *Id*.

Again on October 22, 2005, Dr. Dombrovski stated that although Plaintiff's prognosis had improved, she would still be unable to work. R. 6-5, at 55. He did indicate that she might be able to perform job-related duties in about two to three months' time. *Id*. On August 19, 2006, Dr. Dombrovski stated that he had advised Plaintiff to stop working and he could not foresee when Plaintiff would be able to return to work. R. 6-6, at 42. He did, however indicate that Plaintiff did not have any psychiatric impairment that would prevent the possibility of vocational rehabilitation. *Id*.

Plaintiff cites to 20 C.F.R. § 404.1527 and 56 F.R. § 36932, asserting that these sections contain "clear enough" language establishing a "stated preference" for the medical opinions of treating sources. Pl.'s Br., at 13. However, in arguing that the medical opinions of treating

15

sources deserve great weight, Plaintiff attempts to attach greater relevance to Dr. Dombrovski's

disability opinions than is warranted.  In particular, Plaintiff highlights the following text from 56

F.R. § 36932:

> "All things being equal, when a treating source has seen a claimant long
> enough to have obtained a detailed longitudinal picture of the claimant's
> impairment(s), we will always give greater weight to the treating source's
> opinion than to the opinions of nontreating sources even if the other opinions
> are also reasonable or even if the treating source's opinion is inconsistent with
> other substantial evidence of record."

Plaintiff, however, wholly ignores the full context of  56 F.R. § 36932 which directs that

although a treating source's medical opinions on the disability of a claimant are to be accorded

substantial weight, they do not deserve any special significance, because these opinions are on

matters reserved to the Commissioner.[3]  Specifically, 56 F.R. § 36932 states:

> [The] determinations on these issues [that is, the determinations on disability] .
> . . are strictly the responsibility of the Secretary and that opinions which
> address these issues can only be given weight proportionate to the extent to
> which we can find that they are supported by the remainder of the record.  The
> Act requires such determinations to be made by a State agency or the Secretary.
> To give a treating source's opinion on such an issue controlling weight would,
> in actuality, confer upon the treating source the authority to make the
> determination, and would not, in our view, be consistent with the statute.

In other words, a medical statement or opinion expressed by a treating source, such as the

claimant is "disabled" or "unable to work," is not dispositive or controlling.  *Adorno v. Shalala,*

---

[3]See also 20 C.F.R. §404.1527(e)(1-2) (2002).  The Commissioner's Social Security
Ruling ("SSR") 96-2p, "Policy Interpretation Ruling, Titles II and XVI: Giving Controlling
Weight to Treating Source Medical Opinions," and SSR 96-5p, "Policy Interpretation Ruling,
Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner," provide
further illumination into the distinction between medical opinions entitled to controlling weight
and those reserved to the Commissioner.

40 F.3d 43, 47-48 (3d Cir. 1994), citing *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990)

("[T]his type of [medical] conclusion cannot be controlling. 20 C.F.R. § 404.1527 (1989)

indicates that [a] statement by your physician that you are disabled or unable to work does not

mean that we will determine that you are disabled. We have to review the medical findings and

other evidence that support a physician's statement that you are disabled.") (internal citations

omitted).

It is clear that the ALJ did examine Dr. Dombrovski's records and other parts of the

administrative record pertaining to the treatments of Plaintiff for her depression.  R. 6, at 21-22.

The ALJ noted that Plaintiff was referred to Dr. Dombrovski after being discharged from a

hospital stay that lasted through much of July 2005.  R. 6, at 21.  The ALJ also noted that

Plaintiff's medical records established a conservative improvement in Plaintiff's conditions due

to medication adjustments and mental status examinations which showed an overall "cooperative

behavior and grossly intact cognition."  *Id.*

A review of the record does support the ALJ's findings.  When Plaintiff first met with Dr.

Dombrovski on July 25, 2005, her mood had improved and Dr. Dombrovski had reduced the

amount of lithium Plaintiff was taking.  R. 6-4, at 50.  On August 2, 2005, Plaintiff's mood was

still pretty good and she reported being "very satisfied" with the lithium.  R. 6-4, at 47.   On

August 9, 2005, Plaintiff's morale was low and Dr. Dombrovski increased the dosage of lithium

to 750mg (she was previously taking 600mg); he prescribed another dosage increase on August

13, 2005 (this time to 900mg) and on September 24, 2005 (1050mg).  R. 6-4, at 38, 46.  By

October 15, 2005, Plaintiff's mood had improved and her insight was good.  R. 6-4, at 37.  About

two weeks later, Plaintiff's lithium dosage had been reduced to 900mg and then 600mg in November 2005 . R. 6-4, at 36, 54. By November 11, 2005, Plaintiff's had improved with medication and she was "doing well." R. 6-4, at 54.

The record is unclear about the decision made at the beginning of 2006 regarding Plaintiff's use of lithium but the record does show that by January 16, 2006, Plaintiff's condition had worsened, she had become hypomanic, and Dr. Dombrovski had started prescribing Seroquel (600mg) which is also used for bipolar depression. R. 6-5, at 50. The Seroquel did improve Plaintiff's condition with Dr. Dombrovski reporting that while still anxious, Plaintiff was "otherwise doing well" and was starting to exercise. R.6-5, at 48. Dr. Dombrovski maintained Plaintiff's Seroquel dosage at 600mg and by May 2006, she was feeling "less depressed" and was "very animated during [the] interview." R. 6-5, at 45. In June 2006, Plaintiff had sold her house and was doing much better. Dr. Dombrovski, however, increased her Seroquel dosage to 900mg. R. 6-5, at 44. On July 15, 2006, Dr. Dombrovski lowered the Seroquel dosage back to 600mg but noted that Plaintiff had missed taking her Prozac medication on two occasions. R. 6-5, at 43. As the record supports the ALJ's finding that Plaintiff's condition was maintained and improved with evaluation and medication, the Court concludes that the ALJ properly evaluated Dr. Dombrovski's medical opinions and properly found that his exclamations of Plaintiff's disability was not supported by the record evidence.

Plaintiff raises other ancillary contentions in support of her argument that the ALJ did not properly consider Dr. Dombrovski's medical opinions. She asserts that "Dr. Dombrovski's August 19, 2006 office note, the last note of record, indicates in [sic] increase in her Prozac

dosage, [and this is] hardly evidence of an 'improved' condition." Pl.'s Br., at 14. She offers as support, Mr. Majcher's opinion that the medications Plaintiff received for her mental state have only resulted in "moderate to no success". *Id*. She also appears to argue that the Dombrovski record notation stating Plaintiff needed a recommendation letter to the OVR should not be considered in the deliberation on Plaintiff's disability. The Court finds Plaintiff's contentions to be without merit.

The record reflects that Plaintiff was prescribed Prozac as part of her medication regimen during 2005 and 2006. Plaintiff received 40mg of Prozac until February 2006. She resumed usage of Prozac at the end of March 2006 (initially starting with 20mg and eventually moving up to 40mg). R. 6-5, at 47. Dr. Dombrovski maintained Plaintiff's usage of Prozac at 40mg until August 19, 2006 when he increased her dosage to 60mg. Contrary to Plaintiff's assertion that this increase in the dosage of Prozac signifies a showing of disability, the increase in Prozac is indicative of Plaintiff's medication regimen which consisted of medication adjustments and mental status examinations, as evident in the aforementioned description of Plaintiff's condition from 2005 to 2006.

The ALJ did consider Mr. Majcher's letter and noted that Mr. Majcher's opinion deserved little weight because it appeared "to be based on [Plaintiff's own] report as there [was] no clinical evidence to support his subjective conclusions." R. 6, at 21. Mr. Majcher's October 6, 2006 letter is indeed unsupported by the record which includes: (1) Plaintiff's meeting with Dr. Barua in May 2006 where she informed him of her intention to visit OVR; (2) Plaintiff's OVR vocational assessment, conducted in September 2006, which stated that Plaintiff would be able to

perform "occupations that were "mildly complex, non-speeded, medical clerical type of work"

which were generally "less physically demanding and highly over learned/structured" and; (3) a

self-assessment form completed the day before the date of Mr. Majcher's letter in which Plaintiff

stated that she was not depressed and was able to sleep eight hours a night with no interruption.

R. 6-6, at 16; R. 6-7, at 33.  Furthermore, the Court agrees with the Defendant that Mr. Majcher

is not an acceptable medical source as defined by the regulations.  20 C.F.R. § 404.1513.

      2.      *The ALJ properly found that Plaintiff's psoriasis was not a severe impairment.*

Plaintiff argues that "the ALJ was obviously aware of plaintiff's psoriasis, but for reasons

unknown, did not include this condition in her disability analysis."  The Court finds this

argument to be disingenuous.  Plaintiff's application for disability insurance benefits recorded the

original onset date of disability to be May 11, 2005.  R. 6, at 28.  Furthermore, she listed the

primary and secondary reasons for her disability as bipolar disorder and status post left hip injury.

R. 6, at 28, 43.  She later amended her onset date of disability to June 18, 2005.  R. 6-7, at 42.

During the administrative hearing, Plaintiff intimated that she chose June 18, 2005 as the

onset date because she was not able to work due to the accident she was in, on the same day.  *Id*.

She did not testify that her disability was due to psoriasis, more so as she worked continuously

even with the diagnosis of psoriasis; rather, she attributed her disability to depression and the

June 2005 car accident.  The only time the subject of psoriasis was broached during the hearing

was when she testified about the limited use of cortisone injections in her left hand due to the

cortisone cream and ointments she uses for psoriasis.  R. 6-7, at 46.

As noted earlier, the ALJ found at step two of the five-step sequential evaluation that

Plaintiff was severely impaired due to her bipolar disorder with depression and headaches.  R. 6, at 18.  At step three, the ALJ found that Plaintiff does not have any impairment or combination of impairments that meets or medically equals a listed impairment in 20 C.F.R. Part 404, Subpart P.  *Id*.   In arguing for a finding of psoriasis as a severe impairment, Plaintiff appears to lump together steps two and three and cites to Medical Listing § 8.05 (hereinafter "ML § 8.05") and SSR 85-28 as further support for her argument.  She also refers to the diagnoses of psoriasis, by some of Plaintiff's treating sources, as evidence of the severity of her condition.

ML § 8.05 defines Dermatitis, a category of skin disorder, as involving "extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed" and it lists psoriasis as an example.  SSR 85-28 states the following:

> "An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work . . . . The severity requirement cannot be satisfied when medical evidence shows that the person has the ability to perform basic work activities, as required in most jobs. Examples of these are walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting. Thus, these basic work factors are inherent in making a determination that an individual does not have a severe medical impairment."

Plaintiff goes to great lengths to chronicle her history of psoriasis and the Court notes that her treatment for psoriasis, as established by the record, is extensive.  On November 9, 2000, Plaintiff saw Dr. Jeffrey Wolfe (hereinafter "Dr. Wolfe") who noted that she needed a change of medication as her previous regime of Dovonex and Ultravate were no longer effective.  R. 6-4, at

28.  She continued to experience flare ups up until the time of her accident in 2005 and well into

2006.  R. 6-4, at 3, 5 and 7; R. 6-5, at 34-37.  Dr. Dombrovski also noted Plaintiff's psoriatic

symptoms during her visitations with him.  R. 6-3, at 23, 25; R. 6-4, at 36-40, 43-44, 46, 50; R.

6-5, at 42, 44-50, 52-55; R. 6-6, at 42-43.  Despite Plaintiff's attempt to equate these instances of

psoriasis diagnoses as evidence of disability, the record does not establish that the psoriasis

contributed to abnormalities that were more than slight or that affected Plaintiff's ability to work.

SSR 85-28.

Furthermore, Plaintiff fails to show that her psoriasis symptoms meet all of the criteria for

ML § 8.05.  The Supreme Court elaborated explicitly on the meaning of matching or equaling a

listed impairment.  In *Sullivan v. Zebley*, the Supreme Court stated that, "[f]or a claimant to

qualify for benefits by showing that his unlisted impairment, or combination of impairments, is

'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the

criteria for the one most similar listed impairment.  493 U.S. 521, 531-532 (1990) (emphasis in

original).  *See also Petition of Sullivan*, 904 F.2d 826, 839 (3d Cir. 1990).  Plaintiff is quick to

point out that Dr. Wolfe "document[ed] psoriatic flare ups which lasted for 3 months despite

treatment" but she is not able to establish any evidence of extensive skin lesions as warranted by

ML § 8.05.  Pl.'s Br., at 19.

3.      *The hypothetical question posed by the ALJ to the vocational expert was accurate.*

Plaintiff also raised the argument that as the ALJ erred in not according significant weight

to Dr. Dombrovski's opinions and in determining that Plaintiff did not suffer from a severe

mental impairment, the hypothetical question posed to the vocational expert was, consequently,

inaccurate.  As the Court has already addressed the factual bases underlying this argument, and found that Plaintiff's assertions were not supported by the evidence of record, the Court need not, and will not address this contention.  Thus, the Court finds that the hypothetical question was accurate and sufficient under the circumstances.

## IV.    Conclusion

The Court has reviewed the ALJ's findings of fact and decision, and determines that her finding that Plaintiff was not disabled under the Social Security Act is supported by substantial evidence.  Accordingly, the Court will grant the Commissioner's Motion for Summary Judgment, deny Plaintiff's Motion for Summary Judgment and enter judgment in favor of the Commissioner.

An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JUDITH CORONA,                           )
                                         )
               Plaintiff,       )     2:07-cv-1419
                                           )
    v.                                   )
                                         )
MICHAEL J. ASTRUE,              )
COMMISSIONER OF SOCIAL SECURITY,   )
                                         )
               Defendant.    )

## ORDER OF COURT

AND NOW, this 20th day of November, 2008, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that:

1.     Plaintiff's Motion for Summary Judgment (Document No. 10) is **DENIED**.

2.     Defendant's Motion for Summary Judgment (Document No. 8) is **GRANTED**; and

3.     The Clerk of Court shall docket this case closed.

BY THE COURT:

<u>s/Terrence F. McVerry</u>
United States District Court Judge

cc:    Karl E. Osterhout
       Email: karl@keolaw.com

       Paul Kovac, Esquire
       Email: paul.kovac@usdoj.gov